## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| ERIN NAYLOR, on behalf of the BAE Systems Employees' Savings and Investment Plan, | ) ) ) ) ) |
| Plaintiff, | ) |
| vs. | ) ) |
| BAE SYSTEMS, INC., | ) ) |
| Defendant. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff, Erin Naylor ("Plaintiff"), respectfully files this Class Action Complaint against Defendant BAE Systems, Inc. ("Defendant"), for breaching its fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA"). Specifically, Defendant violated ERISA by: (1) causing the BAE Systems Employees' Savings and Investment Plan ("Plan") to pay excessive and unreasonable compensation to the Plan's recordkeeper resulting in unreasonably high costs to Plan participants. In further support thereof, Plaintiff alleges as follows:

## BRIEF OVERVIEW

1.      This class action is brought against Defendant, the Plan's fiduciary, for breach of Defendant's ERISA fiduciary duty to prudently administer the Plan.

2.      "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries….Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This

principal favors liberal construction of Plaintiff's pleadings. *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

3.    To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

4.    Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees paid by Plan participants to administer the Plan can dramatically reduce the amount of benefits available when participants are ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

5.    The impact of excessive fees or compensation to third-party service providers on employees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

6.    As of December 31, 2022, (the last year in which the Defendant filed a 5500 Annual Disclosure for the Plan with the U.S. Department of Labor), the Plan had $8,232,987,243 in assets

and 48,359 participants with account balances. Instead of leveraging the Plan's tremendous assets and bargaining power to benefit Plan participants, Defendant caused the Plan to pay unreasonable and excessive compensation for recordkeeping and other administrative services to the Plan's recordkeeper, Alight Solutions.

7.      On October 10, 2023, Defendant announced that it caused the Plan to change its recordkeeper from Alight Solutions to Empower Retirement. However, for purposes of this Complaint the identity of the recordkeeper is not material.

8.      Defendant agreed to compensate the Plan's recordkeeper in two important ways. First, Defendant agreed that the Plan's recordkeeper would receive a direct payment from Plan participants each year in the amount of approximately $125 per Plan participant, per year. For example, in 2022, Defendant caused the Plan to pay the recordkeeper $5,987,905 in direct compensation. There were 48,359 Plan participants with account balances at the end of 2022. So, $5,987,905 (direct compensation) / 48,359 (Plan participants) = $124 per Plan participant. The direct compensation alone is excessive. A Plan like the one here should pay no more than $25 per participant, per year for recordkeeping services. Thus, had Defendant acted prudently, in 2022 the Plan would have paid total compensation to the recordkeeper of $25 (per participant x 48,359 (Plan participants) = $1,208,975. Accordingly, in 2022 Defendant caused the Plan to pay excessive direct compensation to the recordkeeper of about $4,751,037. Defendant caused the Plan to pay the recordkeeper excessive direct compensation in similar amount throughout ERISA's six-year limitation period.

9.      But it gets worse for Defendant. Defendant also agreed the recordkeeper would receive additional compensation from the Plan via "float." Float is money in transit in or out of the Plan. Defendant agreed that anytime Plan participants deposit or withdraw money from their

individual accounts in the Plan, that money will first pass through the recordkeeper's clearing account. Plan participant money typically sits in the recordkeeper's clearing account for at least 2-3 days (often much longer). Defendant has agreed any investment returns and/or interest earned on Plan participant money while it is in the recordkeeper's clearing account shall belong to the recordkeeper. This is an <u>additional</u> form of compensation – indirect compensation – the recordkeeper received from the Plan.

10.    There is more than $8 billion of assets in the Plan. The Plan's Annual Form 5500 disclosures show that during the relevant time period the daily average Plan cash in the recordkeeper's clearing account was at least $3 million. A five-day float using present value shows that if the recordkeeper invested the float in a simple S&P 500 fund, the recordkeeper would have earned more than $10,000,000 from "float" during the limitations period.

11.    The U.S. Department of Labor has issued guidance concerning fiduciary duties for payment of compensation by plan sponsors to recordkeepers via float. The Department of Labor instructs that an ERISA fiduciary acts imprudently when it allows recordkeepers to receive float compensation, unless plan fiduciaries, substantively understand the arrangement, monitor the compensation received by recordkeepers from float, negotiate the amount, and include the compensation in the total mix of compensation a recordkeeper receives from a plan for providing service to the plan. This is a common-sense approach.

12.    In 2002, the Department of Labor issued Field Assistance Bulletin 2002-3 (Nov. 5, 2002), attached as Exhibit 1. Specifically, the bulletin describes what a fiduciary needs "to consider in evaluating the reasonableness of an arrangement under which the service provider will be retaining 'float' and what information [] a service provider [is] required to disclose to plan fiduciaries with respect to such arrangements…" *Id*. at *1. The document then sets out steps that

plan fiduciaries and service providers should take to ensure that float practices are adequately disclosed, reviewed, and compensation is reasonable – as required by ERISA.

13.     In short, Defendant has not tracked, monitored, negotiated, or even substantively recognized that the Plan's recordkeeper receives as millions of dollars from float compensation. This is money that should have been used to reduce or offset completely the additional millions of dollars in direct compensation the recordkeeper received from the Plan during the relevant time period. It was imprudent for the Defendant, as noted by the U.S. Department of Labor, for Defendant to ignore millions of dollars in compensation received by the recordkeeper from the Plan.

14.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendant's unlawful conduct. Plaintiff and the putative class members are entitled to receive benefits in the amount of the difference between the value of their individual Plan accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

15.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

16.     Defendant did not adhere to fiduciary best practices to control Plan expenses. To the extent that Defendant made any prudent attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that the compensation the recordkeeper received from the Plan was reasonable.

17.     Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty

of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

18.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

19.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## THE PLAN

20.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

21.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

22.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

23.     Eligible current and former employees of Defendant are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many of Defendant's former employees.

## THE PARTIES

### *Plaintiff & Standing*

24.     Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7) because she is eligible to receive benefits under the Plan. Plaintiff is a current participant in the Plan.

25.    In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

26.    The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

27.    Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

28.    To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because she participates in the Plan and was injured by Defendant's unlawful conduct.

29.    To establish standing, the Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. Plaintiff alleges such an injury for the claim herein.

30.    In other words, the Plaintiff has standing because the challenged conduct, including Defendant's actions resulting in Plaintiff and the class members paying excessive compensation to the recordkeeper, which affected all Plan participants in the same way, including Plaintiff.

31.    Plaintiff's individual account in the Plan suffered losses because her Plan account was assessed an excessive amount for recordkeeping, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and prudently monitored and controlled

compensation to a reasonable level. That money should have gone towards retirement.

32.     Plaintiff is currently invested in the Plan and, as such, continues to pay the excessive recordkeeping expenses identified herein. As a current participant in the Plan, she has standing to seek prospective relief, including the changes identified in the "Prayer for Relief" below.

33.     As a result of Defendant's actions, the Plaintiff and class members are entitled to restitution in the amount of the difference between the value of their Plan accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

### *Defendant is the Plan Administrator*

34.     Defendant is the "named fiduciary" to the Plan because it is the Plan administrator as that term is defined by ERISA. Defendant also exercised authority and discretionary control respecting the management of the Plan. Defendant is thus a statutory fiduciary to the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

### *Additional Information on the Plan*

35.     The Plan is a defined contribution salary deferral plan under Section 401(k) of the Internal Revenue Code ("IRC"). All persons employed by Defendant and its participating affiliates are eligible to participate in the Plan except those with collective bargaining rights, unless negotiated.

36.     The Plan is subject to the provisions of ERISA.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[1]

> All persons, except Defendant's fiduciaries and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between March 8, 2018, and the present (the "Class Period").

38.     The members of the Class are so numerous that joinder of all members is impractical. There were 48,359 Plan participants with account balances, as of December 31, 2022. There were more than 40,000 Plan participants at all times during the six-year relevant time period.

39.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendant's mismanagement of the Plan. Defendant treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

40.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendant is a fiduciary of the Plan;
>
> B.     Whether Defendant agreed to allow the Plan's recordkeeper to receive excessive direct compensation from the Plan;
>
> C.      Whether Defendant agreed to allow the Plan's recordkeeper to receive excessive indirect compensation from the Plan;

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification, or subsequent pleadings in this action.

D.    Whether Defendant agreed to allow the Plan's recordkeeper to receive compensation via float from Plan assets;

E.    Whether Defendant was informed about the amount of compensation the Plan's recordkeeper received from float;

F.    Whether Defendant included in its negotiations with the Plan recordkeeper in regard to the compensation the recordkeeper received from the Plan via direct compensation and via the compensation the recordkeeper was receiving via float;

G.    Whether Defendant monitored and tracked the amount of compensation the recordkeeper obtained from the Plan;

H.    Whether the Defendant disclosed to the Plan participants the amount of compensation the recordkeeper received from the Plan;

I.    Whether the Defendant disclosed any information to Plan participants about the amount of compensation the Plan's recordkeeper received via float;

J.    Whether Defendant failed to prudently ensure the Plan's compensation to the recordkeeper was being managed in compliance with ERISA;

K.    The proper form of equitable and injunctive relief; and

L.    The proper measure of relief.

41.    Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

42.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of

conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

43.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANT'S FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

44.    ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

45.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

46.     As described above, Defendant was—and still is—a fiduciary of the Plan because Defendant:

       A.     is so named; and/or

       B.     exercised authority or control respecting management or disposition of the Plan's assets; and/or

       C.     exercised discretionary authority or discretionary control respecting management of the Plan; and/or

       D.     had discretionary authority or discretionary responsibility in the administration of the Plan.

47.     As a fiduciary, Defendant was/is required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan here. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

48.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted).

49.     During the Class Period, Defendant did not act prudently, nor in the best interests of the Plan's participants, because it caused Plan participants to pay excessive and unreasonable compensation to the Plan's recordkeeper.

50.     During the Class Period Defendant failed to maintain and/or utilize a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees and reasonable compensation to the Plan's recordkeeper. Additionally, Defendant

failed to leverage the size of the Plan to negotiate the lowest (or even prudent) levels of fees for Plan participants. Defendant instead caused the Plan and its participants to pay excessive compensation to the Plan's recordkeeper.

51.     As set forth in detail below, Defendant breached its fiduciary duties to the Plan and its participants and beneficiaries and is therefore liable for breaching those duties under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

52.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

53.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

54.     Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is,

---

[2]  Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited November 8, 2022).

the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

55.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[3] Although 401(k) accounts are fully funded at all times, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

56.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must establish a prudent process for selecting service providers and ensuring that fees are reasonable. *See* "A Look at 401(k) Plan Fees," *supra*.

### <u>Defendant Failed to Monitor or Control the<br>Plan's Recordkeeper's Compensation</u>

57.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

---

[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited November 4, 2022).

58.     Nearly all recordkeepers in the marketplace offer this range of services. The services are essentially the same. Many of the recordkeeping services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

59.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

60.     The compensation the Plan's recordkeeper received from the Plan is and remains excessive in relation to the services that the recordkeeper provided to the Plan because, in fact, the services provided were nothing out of the ordinary, are available from other recordkeepers for much less money, and a prudent fiduciary would have observed the excessive compensation being paid to the recordkeeper and taken corrective action.

61.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

62.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by taking money from Plan participants' investments in a practice known as revenue sharing, or via float (or a combination of all three). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping services that the mutual fund company otherwise would have to provide.

63.     Utilizing indirect payment methods is not *per se* imprudent. Plaintiff is not making a claim against Defendant merely because it used indirect methods to pay for recordkeeping.

64.     However, when indirect payment methods are left unchecked, it can be devastating for Plan participants. Nobody sees the money change hands, and very few understand what the total compensation paid to the recordkeeper really is. It is a way to milk large sums of money out of large plans by charging fees that never go down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[4]

65.     Because indirect payments are asset based, they bear no relation to actual services provided, and bear no relation to a reasonable recordkeeping fee and can lead to excessive compensation. Again, it is important to emphasize that fees obtained through indirect payment methods, like float, are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or money moving into and out of the Plan. As the assets in the Plan increase, so too increases the recordkeeping compensation that a recordkeeper pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

66.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeepers' compensation to ensure that such compensation remains reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a

---

[4]   Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited November 8, 2022).

401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid to the recordkeeper and ensure that the compensation is reasonable. *See Tussey II*, 746 F.3d at 336.

67.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's compensation by demanding documents from the recordkeeper that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

68.    Second, prudent fiduciaries make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable compensation for the services provided to a plan, a prudent fiduciary must identify *all* sources of compensation, including direct compensation and indirect compensation received by the Plan's recordkeeper. Prudent fiduciaries closely monitor the amount of compensation to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any compensation that exceeds a reasonable level be returned to the plan and its participants. To the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

69.    Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that

are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

70. Defendant failed to obtain competitive bids ("RFP") during the Class Period which, in turn, caused the Plan to overpay for recordkeeping during the Class Period.

71. By going through an RFP process annually, or at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare compensation in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for lower compensation and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

72. Nowhere in Plaintiff's monthly statements, nor her quarterly statements, nor her annual statements, does Defendant bother disclosing how much compensation the Plan pays its recordkeeper via float. The information is also notably absent from the Plan's Summary Plan Description, U.S. Department of Labor 5500 Annual disclosures, Plan participant statements, or any documents of which Plaintiff is aware.

73. The undisclosed, undocumented, and simply ignored indirect compensation that the Plan's recordkeeper receive from float equals millions of dollars of wasted Plan assets. To make

matters worse, the Plan's assets have increased by nearly $2 billion during the Class Period. That means the recordkeeper's compensation via float has skyrocketed solely due to an increase in Plan assets, and the recordkeeper's compensation will continue to increase unless Defendant honors its fiduciary duties.

74.    And to make matters even worse still, Defendant caused the Plan to pay the recordkeeper millions of dollars each year in excessive direct compensation.

75.    As noted above, plans of a similar size pay no more than $25 per year per participant for all recordkeeping fees. Here, the "direct compensation" Defendant admits it caused the Plan to pay the recordkeeper was excessive, wasting millions of dollars of retirement savings over the Class Period.

76.    In documents made available to Plaintiff thus far, Defendant disclosed the following in direct compensation it caused the Plan to pay the recordkeeper:[5]

- **2022** – $5,987,905 or $124 per participant;

- **2021** – $6,635,838 or $140 per participant;

- **2020** – $6,669,977 or $142 per participant;

- **2019** – $6,375,619 or $139 per participant;

- **2018** – $3,434,663 or $78 per participant.

77.    From 2022 to 2018 Defendant caused the Plan to pay the recordkeeper direct compensation of $29,104,002, or $125 per participant. A reasonable total fee for the services the recordkeeper provided to the Plan during this period would have been no more than $6,000,000.

---

[5] Plaintiff is also seeking Plan losses for excessive compensation to the recordkeeper in 2023 and going forward through the date that the action resolves. Plaintiff does not have these numbers yet because Defendant has made no disclosures concerning recordkeeper compensation beyond December 31, 2022.

Accordingly, Defendant imprudently wasted nearly $23,000,000 in Plan participants retirement savings by causing the Plan to pay the recordkeeper excessive direct compensation.

78.    Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping expenses. The chart below compares the Plan to comparable plans with similar numbers of participants and assets under management for the year 2020:

| Plan | Total Participants | Assets | Recordkeeping Costs | Per Participant |
|---|---|---|---|---|
| Cisco Systems, Inc. 401(k) Plan | 59,460 | $16,306,454,000 | $1,324,571 | $22 |
| Sutter Health Savings Plan | 67,149 | $5,565,602,878 | $1,719,469 | $25 |
| Deseret 401(k) Plan | 35,273 | $4,806,644,891 | $784,040 | $22.23 |
| Thermo Fisher Scientific, Inc., 401k Retirement Plan | 43,691 | $6,618,601,000 | $1,087,324 | $24.88 |

79.    Further, Fidelity Investments (aka FMR, LLC) is one of the country's most respected recordkeepers for retirement plans, like the Plan here. Fidelity has actually provided evidence supporting Plaintiff's position on this discrete issue. Fidelity's own retirement plan was recently sued. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al*., 451 F.Supp.3d 189, 214 (D. Mass. 2020).

80.    Additionally, in the *Moitoso* case Fidelity went on to stipulate as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-record kept plan with at least $1 billion in assets during the Class Period (November 18, 2014, to the present).[6]

81.    In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Defendant could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.  Defendant failed to do so and, as a result, violated its fiduciary duties under ERISA.

## FIRST CLAIM FOR RELIEF
### *Breaches of Fiduciary Duties of Prudence*

82.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

83.    As a fiduciary of the Plan, Defendant was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

---

[6] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

84.     Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant failed to monitor or control the excessive compensation paid for recordkeeping services.

85.     Defendant's imprudence caused the Plan to lose millions of dollars during the Class Period.

86.     Defendant's imprudence will continue to cause the Plan losses unless this case moves forward.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan, respectfully requests that the Court:

1.     Find and declare that the Defendant has breached its fiduciary duties as described above;

2.      Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

3.     Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.     Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.     Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.     Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Certify the Class, appoint the Plaintiff as class representative, and appoint her counsel as Class Counsel;

8.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

9.      Order the payment of interest to the extent it is allowed by law; and

10.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 4th day of April 2024.

Respectfully submitted,

/s Christopher M. FitzPatrick
Christopher FitzPatrick, Esquire
VSB# 90394
Morgan & Morgan, DC PLLC
1901 Pennsylvania Avenue NW, Suite 300
Washington, DC 20006
Email: cfitzpatrick@forthepeople.com
Phone: (202) 772-0566
Fax: (202) 772-0616
Counsel for the Plaintiff


MARC R. EDELMAN
United States District Court
Middle District of Florida
Florida Bar Number: 0096342
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa , Florida 33602
Telephone: 813-577-4722
Email: MEdelman@forthepeople.com


BRANDON J. HILL
United States District Court
Middle District of Florida
Florida Bar Number: 37061
LUIS A. CABASSA
United States District Court
Middle District of Florida

Florida  Bar Number: 0053643
**AMANDA E. HEYSTEK**
**United States District Court**
**Middle District of Florida**
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
 Direct: 813-337-7992
 Main: 813-224-0431
 Facsimile: 813-229-8712
 Email: bhill@wfclaw.com
 Email: lcabassa@wfclaw.com
 Email: aheystek@wfclaw.com

**MICHAEL C. MCKAY**
**United States District Court**
**District of Arizona**
Arizona Bar Number: 023354
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
telephone: (480) 681-7000
Email: mmckay@mckaylaw.us