## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| ERIN NAYLOR, | ) | |
| on behalf of the BAE Systems | ) | |
| Employees' Savings and Investment | ) | |
| Plan, | ) | Civil Action No. 1:24-cv-00536-AJT-WEF |
| | ) | |
|     Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| BAE SYSTEMS, INC., | ) | |
| | ) | |
|     Defendant. | ) | |
| _____ | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Erin Naylor (Plaintiff) is a participant in the BAE Systems Employees' Savings and Investment Plan (Plan). Plaintiff brings this action as a representative of the Plan against BAE Systems, Inc. (Defendant) for (1) breach of Employee Retirement Income Security Act's, 29 U.S.C. §§1001–1461 (ERISA) anti-inurement provision; (2) breach of ERISA's self-dealing prohibited transaction provisions; and (3) breach of ERISA's fiduciary duty of prudence.

## BACKGROUND FACTS

### *Anti-Inurement, Self-Dealing, and Prohibited Transactions*

1.      As the Fourth Circuit has maintained, "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are ... the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).

2.      Under ERISA, retirement plan fiduciaries must discharge their duties of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

3.       ERISA's duty of loyalty requires retirement plan fiduciaries to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

4.       In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund. The Plan is funded by a combination of wage withholdings by Plan participants and contributions by Defendant that are deposited into the Plan's trust fund. Upon their deposit into the Plan's trust fund, all participant contributions and contributions become assets of the Plan.

5.       As an individual account, defined contribution retirement plan, the Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

6.       Plan participants pay for the Plan's administrative expenses through an array of direct and indirect methods, in some instances on a quarterly, yearly, or pro hac basis

7.       The deduction of these expenses from participant accounts reduces the funds available to participants for distribution and/or investing.

8.       Participants in the Plan are immediately vested in their own contributions and earnings thereon. Participants generally are 100% vested in Defendant's contributions immediately.  However, some participants vest in Defendant's contributions upon completion of up to five years of service.

9.      When a Plan participant has a break in service prior to full vesting of the Defendant's contributions, the participant forfeits the balance of the unvested contributions in his or her individual account and Defendant exercises discretionary authority and control over how these Plan assets are thereafter allocated.

10.     The U.S. Department of Labor requires Defendant to file an annual Form 5500 Disclosure for the Plan. The Form 5500 Disclosure is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans.

11.     Defendant has filed annual Form 5500 Disclosures for the Plan during the relevant time period, except the last annual Form 5500 Disclosure for the Plan was filed for the period covering the year ending 2022. Defendant has yet to file a Form 5500 Disclosure for the Plan covering the year ending 2023.

12.     The annual Form 5500 Disclosures are signed by Defendant under penalty of perjury, and with the following declaration by Defendant: "I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete."

13.     The annual Form 5500 Disclosures Defendant filed for the Plan during the relevant period reveal that Defendant takes for itself all unvested contributions in Plan participants' individual accounts when such accounts are forfeited.

14.     By way of example, the following language is included in the Plan's Form 5500

Disclosure for the year ending 2021.

> **Forfeitures**—If the participant withdraws from the Plan due to termination of employment, the non-vested portion of the Employer's contribution is forfeited and is used to reduce future Employer contributions. At December 31, 2022 and 2021, forfeited non-vested accounts totaled $729,159 and $359,984, respectively. For the year ended December 31, 2022, forfeited non-vested accounts of $2,290,404 were used to offset Employer contributions. If the participant resumes employment prior to incurring five consecutive one-year breaks in service, the forfeited amount will be restored to the participant.

15.     Defendant admits in the Plan's annual Form 5500 Disclosures that Defendant took Plan assets and used those assets for its own benefit, to offset Defendant's future contributions, in the following amounts over the following years:

- 2022 – $2,290,404
- 2021 – $2,187,561
- 2020 – $2,313,281
- 2019 – $1,117,635
- 2018 – $986,563
- 2017 – $787,068

Defendant admits to having wrongfully taken for itself $9,682,512 of Plan assets from 2022 to 2016. Plaintiff alleges that Defendant has wrongfully taken for itself Plan assets in 2023 as well, but Defendant has yet to disclose the amount it has taken. Plaintiff seeks all available legal and equitable remedies for amounts wrongfully taken by Defendant from the Plan in 2023.

16.     Defendant has consistently chosen to utilize the forfeited funds in the Plan exclusively for Defendant's own benefit, to the detriment of the Plan and its participants, by using these Plan assets solely to reduce Defendant's contributions to the Plan.

17.     While Defendant's reallocation of the forfeitures in the Plan's trust fund to reduce its contributions benefitted the Defendant by reducing Defendant's own contribution expenses, it

harmed the Plan, along with Plan participants, by reducing Defendant's contributions that would otherwise have increased Plan assets, by causing participants to incur deductions from their individual accounts each quarter, yearly, and/or at different time intervals to cover administrative expenses that would otherwise have been covered in whole or in part by utilizing forfeited funds.

18.     Plaintiff does not allege that Defendant breached ERISA's duty of prudence and loyalty by always using forfeited funds in any particular way – for example by using the forfeited funds to pay and reduce administrative costs of the Plan. Defendant could have used the forfeited funds in a myriad of ways to benefit the Plan. For example, the forfeitures could have been reallocated to the remaining Plan participants under a nondiscriminatory formula. Indeed, Defendant's Summary Plan Descriptions that were provided to Plaintiff and Plan participants provide that forfeited funds "may be used to offset obligations of [Defendant] to make contributions to the Plan or to reduce or offset administrative expenses of the Plan in the discretion of the Plan Administrator to the extent that it is legally permissible for these expenses to be paid."

19.     Contrary to statements made by Defendant to Plan participants forfeited funds were always used for Defendant's benefit. There was no discretion, process, consideration of using forfeited funds for anything other than to benefit Defendant.

20.     Plaintiff alleges that given the specific context and circumstances prevailing at the time Defendant acted throughout the relevant time period with respect to forfeited funds that it was imprudent and disloyal for Defendant to *always* use forfeited funds for its own benefit and not for any benefit of the Plan or the Plan's participants.

### *Duty of Prudence*

21.     Because savings in retirement plans grow and compound over the course of the employee participants' careers, excessive fees paid by Plan participants can dramatically reduce

the amount of benefits available when participants are ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

22.     The impact of excessive fees or expenses on employees' retirement assets is significant; the impact is far more significant than most believe – especially over time. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

23.     Defendant breached its duty of prudence by causing the Plan and Plan participants to pay unreasonable and excessive compensation to the Plan's recordkeeper (Alight Solutions)[1] and to the Plan's legal counsel (Groom Law Group).

24.     Defendant breached its ERISA fiduciary duty of prudence by causing Plan participants to pay excessive compensation to the Plan's recordkeeper for a so-called "Professional Management Program" (PMP) wherein the Plan's recordkeeper charges Plan participants a fee of .45% of all assets invested in a participant's account up to the first $250,000 of assets and .30% of all assets above $250,001. This is an additional fee charged to Plan participants, on top of other asset-based investment related fees.

25.     The Plan's recordkeeper does not actually provide any investment advice or any meaningful services in connection with the PMP. Instead, the recordkeeper subcontracts with

---

[1] On October 10, 2023, Defendant announced that it caused the Plan to change its recordkeeper from Alight Solutions to Empower Retirement. However, for purposes of this First Amended Complaint the identity of the recordkeeper is not material.

Financial Engines Advisors, L.L.C. (Financial Engines) to provide the ostensible services. However, Plaintiff alleges that Financial Engines failed to provide any meaningful services for the exorbitant fees charged. The exorbitant fee is supposed to be received in exchange for customized strategic investment management services. But Plan participants do not receive personalized investment management services. Instead, their Plan accounts are essentially expensive target date funds focused on a single demographic factor of age.

26.     The PMP was marketed as discretionary portfolio management service by the recordkeeper for a fee to makes investment decisions for a Plan participant within the confines of the Plan and its fund options.

27.     In general, most retirement plan participants who offer participants a PMP (or similar service) expect to receive a target date fund-like experience. *See* Aon, Are Managed Accounts More Efficient Than Target Date Funds? (2020).

28.     Typically, PMP providers build simple portfolios with less diversification than the most "vanilla" target date funds. *Id.* Such was the case here. The Vanguard target date funds offered in the Plan's investment menu contain far more diversification than the diversification the PMP provides. The Vanguard target date funds offered in the Plan's investment menu also receive far more attention and daily management than the PMP program provides to Plan participants.

29.     The PMP portfolios in the Plan are meaningfully more expensive and not meaningfully more diversified. There is no meaningful benefit to paying .45% off all a Plan participant's retirement assets to participate in the PMP when Plan participants can invest in one of the Vanguard target date funds in the Plan, which have far more diversification and receive much more active management services, for just .05%.

30.     Recordkeepers in the retirement plan marketplace can deliver many of the benefits they claim to deliver through managed account programs, like the PMP here, for no additional fee. *Id.* Indeed, the recordkeeper here provides Plan participants with online investing advice for free.

31.     The PMP fees account for a significant portion of administrative fees paid by the Plan and its participants. The lack of transparency makes it hard to determine whether the service provides value. *See* Aon, Can You Truly Evaluate Managed Accounts Through Marketing's Rose-Colored Glasses? (2019).

32.     As a result, recordkeepers, like the recordkeeper here, have a powerful incentive to sell managed account services (the PMP program) to Plan fiduciaries, and then to automatically enroll or steer retirement plan participants into the expensive managed account programs – like the one here.

33.     Notably, the Plan's recordkeeper itself even reported that target date funds outperformed managed accounts in median, upside, and downside cases during the relevant time period. *See* Alight Solutions, 2018 Professional Investment Assistance Report: The Impact of Managed Accounts and Target Date Funds in Defined Contribution Plans 2007-2016. This report is especially important here because, again, the Plan's own recordkeeper was reporting from the beginning of the relevant time period here that the fees associated with its PMP program were not justified and excessive. And yet, Defendant imprudently caused its Plan participants to pay the unjustified and excessive fees, resulting in waste of millions of dollars of Plan assets and retirement savings.

34.     Moreover, the PMP fees bear no rational relationship to any actual services provided to the Plan or its participants.

35.     Plaintiff alleges that Defendant's Plan enrollment process imprudently caused Plan participants to be enrolled in the PMP at their expense and to the financial benefit of the Plan's recordkeeper. Plan participants were imprudently steered into or automatically enrolled in the PMP by the recordkeeper. This significantly and imprudently increased the fees paid to the recordkeeper (who then apparently kicked back some of the fees to Financial Engines) by Plan participants with zero benefit to Plan participants. Defendant's imprudence resulted in wasted plan assets and lost retirement savings.

36.     Prudent fiduciaries would not enroll Plan participants, who tend to be disengaged and do not provide detailed and consistent personalized information to the recordkeeper, necessary for the recordkeeper to even conceivably justify the fees charged to participants for the expensive PMP program, when much less expensive target date funds for that purpose are readily available – and already on the Plan's menu of investment options with a fee of just .05% of assets invested in just the target date funds. Defendant has caused and imprudently allowed Plan participants to pay a fee of .45% (plus all the underlying fees of the actual investments) to invest retirement savings that should have only carried a .05% fee. This is a 900% increase in fees – at minimum. The colossal PMP fee bears no relationship to any services provided and is wildly excessive by any reasonable standard.

37.     To make matters worse, the recordkeeper offers Plan participants free online investment advice. The free online advice is substantially the same as the advice the recordkeeper provides for the .45% PMP fee. The recordkeeper pockets millions and millions of dollars each year from the Plan and its participants for services that are available to the Plan and its participants for free.

38.     The excessive unreasonable PMP fees paid by Plan participants inferentially and plausibly establish that an adequate investigation would have revealed to a prudent fiduciary that the Plan's PMP fees are and were excessive, unreasonable, and imprudent.

39.     Defendant retained Groom Law Group to provide legal services to the <u>Plan</u>. Groom Law Group provides ERISA compliance consulting services to the Plan.

40.     The Plan's Annual Form 5500s show that the Plan paid Groom Law Group $704,480 in 2020, $658,659 in 2021; and $700,558 in 2022.

41.     Groom Law Group is pocketing roughly $700,000 per year from the Plan.

42.     The fees Defendant is causing the Plan to pay Groom Law Group are excessive and unreasonable in relation to services provided to the Plan. The fees are excessive and unreasonable in relation to the fees paid by retirement plans in general for ERISA consulting services. Moreover, the fees are excessive and unreasonable in comparison to fees paid by similarly sized retirement plans for whom Groom Law Group provides the same or similar services to the Plan here. By way of illustration, the table below shows fees paid to Groom Law Group by similarly sized retirement plans, as reported on those Plans' respective 2022 annual Form 5500 Disclosures.

| Plan Name | Plan Assets | Groom Law Group Compensation |
|---|---|---|
| Paramount Global 401(k) Plan | ~$5.4 billion | $10,948 |
| Colgate Palmolive Company Employees Savings & Investment Plan | ~$3.5 billion | $12,379 |
| Hess Corporation Employees' Savings Plan | ~$2.5 billion | $34,551 |
| The Hershey Company 401(k) Plan | ~$2.1 billion | $25,276 |

| XPO Logistics Retirement Savings Plan | ~$2 billion | $15,194 |
|---|---|---|
| Pacific Life Insurance Company Retirement Incentive Savings Plan | ~$1.6 billion | $17,499 |

43.     The fees the Defendant is causing the Plan to pay Groom Law Group are millions more than what similarly sized retirement plans are paying to Groom Law Group. They are millions more than what other similarly sized retirement plans are paying to other law firms who provide the same or very similar services that Groom Law Group provides to the Plan here.

44.     Moreover, many if not most, retirement Plans do not pay any money to law firms for ERISA consulting services. For example, the Laboratory Corporation of America Holdings 401(k) Savings Plan's annual Form 5500 Disclosure for the year ending 2022 shows that plan had nearly $3 billion in assets invested in that plan and paid zero dollars for ERISA compliance consulting services. By way of another example, the Old Dominion 401(k) Retirement Plan's annual Form 5500 Disclosure for the year ending 2022 also shows that plan had nearly $3 billion in assets invested in that plan and paid zero dollars for ERISA compliance consulting services.

45.     Plaintiff is not aware of any retirement plan of any size that consistently pays anywhere near what the Defendant is causing this plan to pay Groom Law for consulting services.

46.     Defendant is causing the Plan to pay Groom Law millions more than what similarly sized Plans pay for the same or similar services – if such services are paid for at all. And such imprudent waste will likely continue costing the Plan and its participants millions more in lost retirement savings unless prudent fiduciary actions and controls are implemented.

47.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

- 11 -

48.     Defendant did not adhere to fiduciary best practices to control Plan expenses. To the extent that Defendant made any prudent attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to the Plan and its participants were reasonable, and (b) that the compensation third party service providers received from the Plan was reasonable.

49.     Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

50.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

51.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## THE PLAN

52.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

53.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

54.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

55.     Eligible current and former employees of Defendant are eligible to participate in

the Plan. The Plan provides the primary source of retirement income for many of Defendant's former employees.

## THE PARTIES

### *Plaintiff & Standing*

56.     Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7) because she is eligible to receive benefits under the Plan. Plaintiff is a current participant in the Plan.

57.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

58.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

59.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

60.     To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because she participates in the Plan and was injured by Defendant's unlawful conduct.

61.     To establish standing, the Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. Plaintiff alleges such an injury for the claims

- 13 -

herein.

62.     In other words, Plaintiff has standing because the challenged conduct resulted in Plaintiff and Plan participants paying excessive compensation to the Plan's third-party service providers, which affected Plan participants in the same way, including Plaintiff.

63.     Plaintiff's individual account in the Plan suffered losses because her Plan account was assessed excessive fees which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and prudently, not used Plan assets for its own benefit at the expense of Plan participants, and prudently defrayed plan expenses.

64.     Plaintiff is currently invested in the Plan and, as such, continues to pay the excessive expenses identified herein and she continues to be harmed by Defendant's self-dealing with Plan assets. As a current participant in the Plan, she has standing to seek prospective relief, including the changes identified in the "Prayer for Relief" below.

65.     Plaintiff, like most of Defendant's employees was automatically enrolled in the Plan. Plaintiff was then unknowingly steered by Defendant into the PMP. She was instructed by Defendant to use the website created and maintained by the recordkeeper to select investments from the Plan's menu of investment options. The recordkeepers website then guided Plaintiff to the PMP. Plaintiff did not want to enroll in the PMP. She wanted to select investments. But given the recordkeeper's steering through the website, Plaintiff ended up in the PMP. Thereafter, Plaintiff did not receive any personalized investment advisory services.  Indeed, from 2018 to 2023 Plaintiff was invested through the Plan in the same six mutual funds. Those funds include: (1) Dodge and Cox Income; (2) Vanguard Institutional 500 Index Trust; (3) Vanguard Developed Markets Index; (4) Vanguard Emerging Markets Stock Index; (5) Vanguard Retire '50 Trust; and (6) Vanguard Institutional Extended Market Index Trust. The allocation of Plaintiff's retirement

savings in these six funds remained constant and virtually unchanged from 2018 to 2023. Plaintiff paid not only the fees charged by the investment management companies to invest in the above referenced six funds, but she also paid the .45% PMP fee for non-existent professional management services. In 2023 alone, Plaintiff paid $244.90 in PMP fees.

66.     In 2018, Plaintiff's individual account in the Plan had roughly $46,000 in assets. By 2023, Plaintiff's individual account had grown to more than $187,000. Again, Plaintiff paid the .45% PMP fee on all of the assets in her individual account from 2018 to 2023.

67.     In the fourth quarter of 2023, Plaintiff discovered that she was paying the excessive and unreasonable PMP fee and was receiving no services nor value in exchange for the PMP fee. Plaintiff opted out of the PMP and transferred all of her retirement savings to the Vanguard Target Retirement 2055 Trust Select Target Date Fund. Plaintiff now pays a fraction of the fees she had been paying and is earning a much better return on her retirement savings. The PMP program serves only to enrich the recordkeeper at the expense of Plaintiff and Plan participants.

### *Defendant is the Plan Administrator*

68.     Defendant is the "named fiduciary" to the Plan because it is the Plan administrator as that term is defined by ERISA. Defendant also exercised authority and discretionary control respecting the management of the Plan. Defendant is thus a statutory fiduciary to the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

### CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[2]

All persons, except Defendant's fiduciaries and their immediate

---

[2] Plaintiff reserves the right to propose other or additional classes or subclasses in her anticipated motion for class certification, or subsequent pleadings in this action.

family members, who were participants in or beneficiaries of the Plan, at any time between March 8, 2018, and the present (the "Class Period").

70.     The members of the Class are so numerous that joinder of all members is impractical. There were 48,359 Plan participants with account balances, as of December 31, 2022. There were more than 40,000 Plan participants at all times during the six-year relevant time period.

71.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendant's mismanagement of the Plan and self-dealing. Defendant treated Plaintiff consistently with other Plan participants and managed the Plan as a single entity on behalf of Plan participants. Plaintiff's claims and the claims of all Plan participants arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all Class members have been similarly affected by Defendant's wrongful conduct.

72.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.      Whether Defendant is a fiduciary of the Plan?;

B.      Whether Defendant breached its ERISA fiduciary duties to the Plan with respect to the management and allocation of Plan assets?;

C.      Whether Defendant engaged in ERISA prohibited transactions with Plan assets?;

D.      Whether Defendant violated ERISA's anti-inurement provision by using Plan assets for its own benefit?;

E.      The proper form of equitable and injunctive relief; and

F.      The proper measure of relief.

73.     Plaintiff will fairly and adequately represent the Class. She has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

74.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

75.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### FIRST CLAIM
### _Breach of Fiduciary Duty of Loyalty – Self Dealing_

76.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

77.     Pursuant to 29 U.S.C. § 1104(a)(1)(A), Defendants were required to discharge their duties to the Qualcomm Plan "solely in the interest of the participants and beneficiaries" and "for

the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

78.     Defendant has continually breached this duty of loyalty with respect to its control and management of the Plan's assets throughout the Class Period by choosing to utilize forfeited funds in the Plan for the benefit of Defendant rather than solely in the interest of Plan participants.

79.     Instead of acting solely in the interest of Plan participants by utilizing forfeited funds in the Plan to reduce or eliminate the administrative expenses charged to their individual accounts, Defendant chose to use these Plan assets for the purpose of reducing its own future contributions to the Plan, thereby saving Defendant more than ten million dollars during the Class Period at the expense of the Plan which received decreased contributions and its participants and beneficiaries who were forced to incur avoidable expense deductions to their individual accounts.

80.     As a direct and proximate result of Defendant's fiduciary breaches described herein, the Plan suffered injury and loss for which it is personally liable and is subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten gains to Defendant resulting from the breach of its duty of loyalty.

## SECOND CLAIM
### *Breach of Fiduciary Duty of Prudence – Forfeited Funds*

81.     Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

82.     Pursuant to 29 U.S.C. § 1104(a)(1)(B), Defendant was required to discharge its duties with respect to the Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

83.     Defendant has continuously breached its duty of prudence under 29 U.S.C. § 1104(a)(1)(B) throughout the Class Period by declining to use the forfeited funds in the Plan to eliminate the administrative expenses charged to participant accounts, or in other ways that benefit solely the Plan, and instead using such Plan assets to reduce the Defendant's own contributions and financial obligations owed to the Plan.

84.     Defendants failed to engage in a reasoned and impartial decision-making process to determine that using the forfeited funds in the Plan to reduce the Defendant's own contribution expenses, as opposed to the administrative expenses charged to participant accounts, was in the best interest of the Plan's participants or was prudent, and failed to consider whether participants would be better served by another use of these Plan assets after considering all relevant factors.

85.     By declining to use forfeited funds in the Plan to eliminate the administrative expenses charged to participant accounts, and instead using such Plan assets to reduce the Defendant's own contribution expenses, Defendant caused the Plan to receive fewer contributions that would otherwise have increased Plan assets and caused participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the forfeited funds to pay Plan expenses.

86.     As a direct and proximate result of Defendant's fiduciary breaches described herein, the Plan suffered injury and loss for which Defendant is personally liable and subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten gains resulting from the breach of its ERISA duty of prudence.

## THIRD CLAIM
### _Breach of ERISA's Anti-Inurement Provision_

87.     Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

88.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

89.    The balance in a participant's account that a participant forfeits when incurring a break in service prior to full vesting of the Defendant's contributions to the participant's account is an asset of the Plan.

90.    By electing to utilize these Plan assets as a substitute for the Defendant's own future contributions to the Plan, thereby saving Defendant millions of dollars in contribution expenses, Defendant caused assets of the Plan to inure to the benefit of the employer in violation of 29 U.S.C. 1103(c)(1).

91.    Defendant failed to employ any reasonable process or give any consideration with respect to the forfeited funds. Rather, Defendant always treated forfeited funds as being reversionary in nature and diverted all of the funds to Defendant for its own benefit.

92.    Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from Defendant's violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through its use of Plan assets, and Defendant is subject to other equitable or remedial relief as appropriate.

## FOURTH CLAIM
### *ERISA Prohibited Transactions*

93.    Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

94.    29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

95.     Defendant is a party in interest, as that term is defined under 29 U.S.C. §1002 (14), because it is a Plan fiduciary and because Defendant is the employer of Plan participants.

96.     Defendant caused the forfeited funds to be removed from the Plan trust and transferred to another account controlled by Defendant. This is a transaction for purposes of  29 U.S.C. § 1106. Defendant then used the forfeited funds (Plan assets) to satisfy Defendant's contractual obligations to the Plan and Plan participants.

97.     By electing to use forfeited funds in the Plan as a substitute for Defendant's contractual and legal obligations to the Plan, and thereby saving Defendant millions of dollars in contribution expenses, Defendant caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or a use of Plan assets by or for the benefit of a party in interest.

98.     As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions and the lost investment returns on those assets.

99.     Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited transactions alleged in this claim, to reverse and/or correct the prohibited transactions, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

### FIFTH CLAIM
#### *ERISA Prohibited Transactions*

100.     Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

101.    29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

102.    Defendant violated this prohibition in their management and control of forfeiture funds in the Plan. By utilizing these Plan assets as a substitute for future employer contributions to the Plan, thereby saving Defendant millions of dollars in contribution expenses, Defendant dealt with the assets of the Plan in its own interest and for its own account.

103.    As a result of this prohibited conduct, Defendants caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions and the lost investment returns on those assets.

104.    Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## SIXTH CLAIM
### *Breach of Fiduciary Duty of Prudence – Excessive Fees*

105.    Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

106.    Defendant, as a fiduciary of the Plan, is responsible for selecting service providers that charge objectively reasonable fees and to select prudent investments, and investment related options for the Plan.

107.    Defendant had a fiduciary duty to do all of the following: ensure that the Plan's administrative fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

108.     Defendant breached its fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's administrative fees (PMP fees and Groom Law fees) were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

109.     Defendant breached its duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's administrative services, including PMP costs and Groom Law's costs, critically or objectively in comparison to other options available to the Plan.

110.     Defendant's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, resulted in Defendant breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

111.     As a result of Defendant's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in objectively unreasonable and unnecessary monetary losses.

112.     Defendant is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendant made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant is subject to other equitable relief as set forth in the Prayer for Relief.

///

///

## SEVENTH CLAIM

### *Failure to Adequately Monitor Other Fiduciaries and Service Providers*

86.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

87.     Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a).  Defendant is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

88.     Given that Defendant had the overall responsibility for the oversight of the Plan, Defendant had a fiduciary responsibility to monitor the performance of the other fiduciaries and service providers, including those delegated fiduciary responsibility to administer and manage Plan assets, and specifically the Plan's recordkeeper and legal counsel.

89.     A monitoring fiduciary must ensure that its monitored fiduciaries and service providers are performing their obligations in a prudent manner and in for a reasonable cost to the Plan, and must take prompt and effective action to protect the Plan and participants when they are not. Defendant breached its fiduciary monitoring duties by, among other things:

> a.     Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.   Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive and reasonable;

e.   Failing to remove appointees whose performance was inadequate in that they continued to maintain service providers charging excessive fees to Plan participants relative to services provided, all to the detriment of Plan participants' retirement savings.

90.   Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan and Plan participants lost millions of dollars of retirement savings.

**<u>PRAYER FOR RELIEF</u>**

For these reasons, Plaintiff, on behalf of the Plan, respectfully requests that the Court:

1.   Find and declare that the Defendant has breached its fiduciary duties and engaged in prohibited conduct and transactions as described above;

2.   Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

3.   Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.   Order disgorgement of all assets and profits secured by Defendant as a result of each ERISA violation described above;

5.   Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

6.   Remove the fiduciaries who have breached their fiduciary duties and enjoin them

from future ERISA violations;

7.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint his counsel as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 20th day of June 2024.

Respectfully submitted,


/s/ *Marc Edelman*
Marc R. Edelman, Esq. (Pro Hac)
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: 813-577-4722
Email: medelman@forthepeople.com

Christopher Michael FitzPatrick, Esq.
**MORGAN & MORGAN, DC, PLLC**
1901 Pennsylvania Avenue, NW, Suite 300
Washington D.C., DC 20006
Telephone: 202-772-0566
Email: cfitzpatrick@forthepeople.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 20th day of June, 2024, the foregoing was electronically filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Marc Edelman*
Marc R. Edelman, Esq.
*Attorney for Plaintiffs and the proposed class*