IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ERIN NAYLOR,<br>*on behalf of the BAE Systems Employees'*<br>*Savings and Investment Plan*,<br><br>*Plaintiff*,<br><br>v.<br><br>BAE SYSTEMS, INC.,<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil No. 1:24-cv-00536 (AJT/WEF) |

## **MEMORANDUM OPINION and ORDER**

In this ERISA breach of fiduciary duty case, Plaintiff's first amended complaint (the "FAC") alleges seven violations of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 (ERISA): (1) breach of the fiduciary duty of loyalty through self-dealing (Count I), (2) breach of the fiduciary duty of prudence through forfeited funds (Count II), (3) breach of ERISA's anti-inurement provision (Count III), (4) prohibited transactions through misuse of forfeited funds under 29 U.S.C. § 1106 (Count IV), (5) prohibited transactions through use of forfeited funds for a fiduciary's self-interest under 29 U.S.C. § 1106(b) (Count V), (6) breach of fiduciary duty of prudence through excessive fees (Count VI), and (7) breach of fiduciary duty through failure to adequately monitor other fiduciaries and service providers (Count VII). [Doc. No. 29] at 17–25. Defendant BAE Systems, Inc. has filed a Motion to Dismiss Plaintiff Erin Naylor's Amended Complaint, [Doc. No. 44] ("Defendant's Motion"), and Plaintiff has filed a Motion to Disqualify Defendant's Counsel, [Doc. No. 38] ("Plaintiff's Motion"). On July 31, 2024, the Court heard argument on both motions. For the reasons stated below, Defendant's Motion is GRANTED and Plaintiff's Motion is DENIED.

1

# I. BACKGROUND

As alleged in the FAC and the documents related thereto, Plaintiff Erin Naylor is a current employee of BAE Systems and a participant in the BAE Systems Employees' Savings and Investment Plan (the "Plan"). [Doc. No. 29] at 1. The Plan is an individual account, defined contribution retirement plan that "provides for an individual account for each participant and for benefits [based] solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." [Doc. No. 19] ¶ 5 (quoting 29 U.S.C. § 1002(34)). Plan assets are held in a trust fund, and the Plan is funded by a combination of wage withholdings by Plan participants and contributions by Defendant that are deposited into the Plan's trust fund. *Id.* ¶ 4. Plan participants are immediately vested in their own contributions, but some participants are vested in Defendant's contributions upon completion of up to five years of service. *Id.* ¶ 8. If a Plan participant has a break in service before Defendant's contributions become fully vested, the balance of the unvested contributions is forfeited. *Id.* ¶ 9. Defendant is the Plan administrator and the "named fiduciary with the overall responsibility for the control, management and administration of the Plan," *id.* ¶ 68,[1] and Plaintiff alleges that "Defendant exercises discretionary authority and control over how these Plan assets are thereafter allocated," *id.*

The core of this case is Plaintiff's claim that Defendant breached its fiduciary duties when it used the forfeitures to offset future employer contributions rather than to "cover administrative expenses" or otherwise "increas[e] Plan assets." *Id.* ¶ 17.[2] More specifically, Plaintiff alleges that

---

[1] While Plaintiff alleges that Defendant is the named fiduciary, Defendant notes that the Plan document identifies an "Administrative Committee" as the named fiduciary with respect to Plan administration, except as to investments. *See* [Doc. No. 47-1] at 124; [Doc. No. 47-2] at 113.

[2] Defendant is required by the U.S. Department of Labor to file an annual Form 5500 Disclosure for the Plan, but Defendant has yet to file a Form 5500 for 2023. *Id.* ¶ 11. As reflected in Defendant's annual Form 5500 Plan

Defendant has "wrongfully taken for itself $9,682,512 of Plan assets from 2022 to 2016," in addition to amounts from 2023 which Defendant has yet to disclose, *id.* ¶ 15; and rather than "using the forfeited funds to pay and reduce administrative costs of the Plan," or "reallocat[ing] [forfeitures] to the remaining Plan participants under a nondiscriminatory formula," Defendant "harmed the Plan, along with Plan participants, by reducing Defendant's contributions that would otherwise have increased Plan assets, by causing participants to incur deductions from their individual accounts each quarter, yearly, and/or at different time intervals to cover administrative expenses that would otherwise have been covered in whole or in part by utilizing forfeited funds." *Id.* ¶¶ 17-18.

With respect to Plaintiff's two claims pertaining to excessive fees, Plaintiff alleges that the Plan "recordkeeper pockets millions and millions of dollars each year from the Plan and its participants for services that are available to the Plan and its participants for free." *Id.* ¶ 37. Specifically, the Plan employs a recordkeeper that provides Plan participants with a "Professional Management Program" ("PMP"), which is marketed as a "discretionary portfolio management service," *id.* ¶ 26, and which "charges Plan participants a fee of .45% of all assets invested in a

---

Disclosures for each relevant year (2017 through 2022), Defendant has used forfeitures to offset required employer contributions in the following amounts:

- 2022 – $2,290,404
- 2021 – $2,187,561
- 2020 – $2,313,281
- 2019 – $1,117,635
- 2018 – $986,563
- 2017 – $787,068

*Id.* ¶ 15. Defendant notes with respect to these amounts that "the amount of forfeitures [used for employer contributions] was less than 0.015 of the amount that BAE Systems contributed annually to participant accounts each year as employer contributions." [Doc. No. 45] at 15. For example, Defendant contributed $164,437,012 in 2022, while forfeitures in 2022 totaled only $2,290,404. [Doc. No. 47-7] at 40, 42. Thus, in 2022, forfeitures comprised just 1.3% of the total employer contributions made. Forfeitures comprised a similar percentage of total contributions for the other relevant years. [Doc. No. 47-3] at 34, 36 (2018 forfeitures totaled $986,563, while 2018 employer contributions totaled $132,613,395); [Doc. No. 47-4] at 32, 34 (2019 forfeitures totaled $1,117,635, while 2019 employer contributions totaled $143,725,267); [Doc. No. 47-5] at 35, 37 (2020 forfeitures totaled $2,313,281, while 2020 employer contributions totaled $156,242,565); [Doc. No. 47-6] at 36, 38 (2021 forfeitures totaled $2,187,561, while 2021 employer contributions totaled $156,062,333).

participant's account up to the first $250,000 of assets and .30% of all assets above $250,001," *id.* ¶ 24. As alleged, while this "fee is supposed to be received in exchange for customized strategic investment management services," *id.* ¶ 25, it in fact "bears no relationship to any services provided and is wildly excessive by any reasonable standard," *id.* ¶ 36. Moreover, the "Plan enrollment process imprudently caused Plan participants to be enrolled in the PMP at their expense." *Id.* ¶ 35. Specifically, "Plan participants were imprudently steered into or automatically enrolled in the PMP by the recordkeeper." *Id.* In short, Defendant's "imprudence resulted in wasted plan assets and lost retirement savings." *Id.* ¶ 35.

Plaintiff also alleges that Defendant pays excessive fees to its counsel, Groom Law Group, for "ERISA compliance consulting services." *Id.* ¶ 39. The Plan's Form 5500s show that Groom receives roughly $700,000 a year in legal fees in relation to these services. *Id.* ¶¶ 40-41. These amounts, Plaintiff alleges, "are excessive and unreasonable in relation to the fees paid by retirement plans in general for ERISA consulting services," and specifically when compared to "fees paid by similarly sized retirement plans for whom Groom Law Group" and other law firms provide "the same or similar services to the Plan here." *Id.* ¶ 42. To illustrate, Plaintiff points to fees Groom received from other similarly sized retirement plans whose assets range from $1.6 billion to $5.4 billion, but whose legal fees during 2022 ranged only from $10,948 to $25,276. *Id.* Thus, Plaintiff claims that Defendant failed to "adhere to fiduciary best practices to control Plan expenses" and "employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to the Plan and its participants were reasonable, and (b) that the compensation third party service providers received from the Plan was reasonable." *Id.* ¶ 48.

On April 4, 2024, Plaintiff filed a putative class action lawsuit behalf of the Plan.[3] [Doc. No. 1]. After Defendant filed a motion to dismiss, Plaintiff filed the FAC. [Doc. No. 29], and Defendant filed a renewed motion to dismiss, [Doc. No. 44]. On June 27, 2024, Plaintiff filed a Motion to Disqualify Counsel, [Doc. No. 38], which seeks to disqualify Groom Law Group from representing Defendant in this action. On August 19, 2024, Plaintiff filed a Motion for Leave to File Notice of Supplemental Authority, [Doc. No. 68], to which Defendant responded, [Doc. No. 69]. On September 4, 2024, the parties filed a Consent Motion for a Ninety-Day Extension of the Scheduling Order. [Doc. No. 70].

## II. LEGAL STANDARD

Under Rule 12(b)(6), a complaint "must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." *Adams v. NaphCare, Inc.*, 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). In addressing a Rule 12(b)(6) motion, a court must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor of the plaintiff. *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009). However, to survive a motion to dismiss, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and citations omitted). Dismissal of a complaint is appropriate when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

---

[3] ERISA § 502 permits a "derivative action to be brought by a retirement plan 'participant' on behalf of the plan to obtain recovery for losses sustained by the plan because of breaches of fiduciary duties." *In re Mut. Funds Inv. Litig.*, 529 F.3d 207, 210 (4th Cir. 2008); *see* 29 U.S.C. §1132(a)(2). Plaintiff brings such a claim here. *See* [Doc. No. 29] ¶¶ 56-60.

While the well-pleaded facts within a complaint are considered by the Court to be true, legal conclusions are not afforded the same presumption. *Id*. at 678.

### III. ANALYSIS

#### A.  Defendant's Motion to Dismiss

Plaintiff's FAC advances two types of claims: (1) that Defendant misused forfeitures in violation of its fiduciary duties under ERISA (Counts I through V), and (2) that Defendant permitted excess fees to be charged to Plan member accounts for managed-account services and legal fees (Counts VI through VII). *See* [Doc. No. 59] at 1.

#### 1.  Counts I Through V: Breach of Fiduciary Duties Relating to Forfeitures

"ERISA imposes three broad duties on ERISA fiduciaries: (1) the duty of loyalty, which requires that 'all decisions regarding an ERISA plan ... be made with an eye single to the interests of the participants and beneficiaries'; (2) the 'prudent person fiduciary obligation,' which requires a plan fiduciary to act 'with the care, skill, prudence, and diligence of a prudent person acting under similar circumstances'; and (3) the exclusive benefit rule, which requires a fiduciary to 'act for the exclusive purpose of prov[id]ing benefits to plan participants.'" *Peters v. Aetna Inc.*, 2 F.4th 199, 228 (4th Cir. 2021) (quoting *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 448–49 (6th Cir. 2002)). Plaintiff claims that Defendant violated ERISA's duties of prudence and loyalty relating to its use of Plan forfeitures. *See, e.g.*, [Doc. No. 29] ¶ 18 (claiming that "Defendant could have used the forfeited funds in a myriad of ways to benefit the Plan, such as "reallocat[ing] [forfeitures] to the remaining Plan participants under a nondiscriminatory formula").

The Plan terms delineate how forfeitures are to be used.[4] First, forfeitures "shall" be used to restore the employer contribution accounts for Plan members who terminated their employment with BAE before they were fully vested, but were subsequently reemployed within the next five years:

> Each employee included in Section 2.4(B)(1) above who was a Participant in the Plan or Superseded Plan, terminated employment before he is fully vested, and is reemployed before he incurs a Break in Service of five full consecutive years shall have any Forfeiture that occurred under Section 9.2(B) (or the corresponding provisions of the Superseded Plan) hereof applicable to him restored in the following manner: the Forfeiture shall be restored to his Matching Contribution Account, Nonelective Contribution Account, and Money Purchase Account, in proportion to the amount of Forfeiture previously taken from the respective account as of the date of the Forfeiture; provided, however if the Participant had received a distribution from his Matching Contribution Account, Nonelective Contribution Account or Money Purchase Account, the Forfeiture shall be restored only in the event that he repays the Trust Fund the amount of such distribution within five years of the date of his reemployment and prior to the date he incurs a Break in Service of five full consecutive years. **The source of funds for making the restorations shall be any currently unallocated Forfeitures and, if necessary, a contribution by the Employer.**

[Doc. No. 47-2] § 2.4(C)(1) (emphasis added).

Second, forfeitures "shall" be used to reduce future employer contributions:

> Subject to Sections 4.1(D) and 4.2 below, each Employer's Matching Contribution, if any, for each payroll period, or other period specified by an Employer, in the Plan Year shall be an amount equal to the amount corresponding to each Employer on Exhibit A; **provided, however, that the amount of contribution determined above shall be reduced by any Forfeitures** under Section 9.2(B) hereof from the Matching Contribution Accounts not previously used to reduce such Employer Contribution (and not required to make current restorations to reemployed Participants under Section 2.4(B) hereof) and **any such Forfeitures shall be treated and allocated as part of the Employer's Matching Contribution for the applicable payroll period.**[5]

---

[4] The Court will consider the written Plan document in the context of Defendant's 12(b)(6) motion because (1) that document is incorporated by reference into the FAC, (2) it is central to Plaintiff's claims, and (3) no party disputes its authenticity. *Clark v. BASF Corp.*, 142 F. App'x 659, 660–61 (4th Cir. 2005)); *see* [Doc. No. 29] ¶ 53 (referencing Plan documents).

[5] Section 9.2(B) similarly provides that "[t]o the extent required, the Forfeitures from the Matching Contribution Accounts, Money Purchase Accounts, and Nonelective Contribution Accounts **will be used to make the restorations** to the Matching Contribution Accounts, Money Purchase Accounts, and Nonelective Contribution Accounts,

*Id.* § 4.1(A)(1) (emphases added). Section 4.1(B)(1) similarly provides:

> Subject to the provisions of Sections 4.1(D) below, each Employer's Nonelective Contribution, if any, for each payroll period in the Plan Year shall be an amount set forth on Exhibit A; **provided, however, that the amount of contribution determined above shall be reduced by any Forfeitures** under Section 9.2(B) hereof from the Nonelective Contribution Accounts not previously used to reduce such Employer Contribution (and not required to make current restorations to reemployed Participants under Section 2.4(B) hereof) and **any such Forfeitures shall be treated and allocated as part of such Employer's Nonelective Contribution for the applicable payroll period.**

*Id.* § 4.1(B)(1) (emphases added). Moreover, the Plan provides that excess forfeitures are carried forward and used as employer contributions in succeeding payroll periods until depleted:

> In the event that as of any given Accounting Date the unallocated Forfeitures that are included as part of Employer Contributions for any payroll period in the Plan Year exceed the amount of Employer Contributions that is required for such payroll period, **such excess shall not be allocated but shall be carried forward and included with Employer Contributions during the next succeeding payroll period until such excess has been depleted.**

*Id.* § 4.1(D)(6) (emphasis added); *see generally* [Doc. No. 47-1].

Together with these unambiguous, mandatory directions with respect to the use of forfeitures, the Plan provides in Section 12.6, which is titled "EXPENSES OF ADMINISTRATION," that, "[a]s directed by the Administrative Committee, expenses to be paid from the Trust Fund **may** be drawn from (a) Participants' Individual Accounts, in the form of flat fees, charges for specific services, or a percentage of the value of each Individual Account, (b) Forfeitures, or (c) earnings or gains in each Investment Fund, to the extent that it is legally

---

respectively, of those Participants who are reemployed, and whose prior Forfeitures are subject to restoration in accordance with Section 2.4(C) hereof, or if there is an excess after all of such restorations are made, **the Forfeiture will be used to offset future Employer Contributions and allocated as part of Employer Contributions**." *Id.* § 9.2(B) (emphases added).

permissible for these expenses to be so paid." [Doc. No. 47-1] § 12.6 (emphasis added).[6] Relatedly, the Summary Plan Descriptions provide that forfeitures "may be used to offset obligations of [Defendant] to make contributions to the Plan or to reduce or offset administrative expenses of the Plan in the discretion of the Plan Administrator to the extent that it is legally permissible for these expenses to be paid." [Doc. No. 29] ¶ 18.

The core issue to how to reconcile those mandatory Plan provisions with respect to the use of forfeitures with the discretion conferred in Section 12.6 with respect to Plan forfeitures. In that regard, Plaintiff advances somewhat different positions. One the one hand, it appears that Plaintiff claims that under ERISA, Defendant was required to use the forfeitures to offset plan expenditures or, as Plaintiff sometimes states, to increase participants' accounts, despite the Plan's mandatory directives otherwise. *See, e.g.*, *id.* ¶ 79 ("[I]nstead of acting solely in the interest of Plan participants by utilizing forfeited funds in the Plan to reduce or eliminate the administrative expenses charged to their individual accounts, Defendant chose to use these Plan assets for the purpose of reducing its own future contributions to the Plan."). In short, Plaintiff claims that under ERISA, despite any Plan provisions to the contrary, Defendant had a fiduciary duty to use the forfeiture to pay administrative expenses, given its obligation to act solely in the best interests of the Plan participants and since any other use would place Defendant's own interests over those of the Plan participants. On the other hand, Plaintiff essentially disclaims reliance on any overriding ERISA duty to use forfeitures to pay plan expenses and simply "alleges that Defendant breached its duties of prudence and loyalty by failing to have any process in place to consider doing anything

---

[6] Section 12.6 further provides that "[a]ll other reasonable costs, charges, and expenses incurred in the administration of this Plan, including but not limited to expenses incurred by the Administrative Committee or the Investment Committee, compensation to the Trustee, compensation to an investment manager, and any compensation to agents, attorneys, actuaries, accountants, recordkeepers, and other persons performing services on behalf of this Plan or for the Administrative Committee or for the Investment Committee will be paid from the Trust Fund (including from mutual and other funds which are assets of the Trust Fund) in such portions as the Administrative Committee may direct, unless paid by the Employers." *Id.*

with forfeited funds – except to take those funds for Defendant's sole benefit." [Doc. No. 58] at 8. Defendant contends that under either theory Plaintiff's fiduciary duty claims as to forfeitures fail because (1) the Plan requires that forfeited employer contributions "shall" remain in the form of employer contributions and be used as such; (2) ERISA's fiduciary duties do not create an entitlement to have the employer use forfeitures to subsidize administrative expenses; and (3) the claims are contrary to analogous and proposed federal regulations[7] that permit the use of forfeited employer contributions to offset future employer contributions. *See* [Doc. No. 45] at 11.

The Plan provisions at issue are to be read together in such a way as to give effect to their intended purpose, as "ERISA plans are contractual documents which, while regulated, are governed by established principles of contract and trust law." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013) (citation omitted). On the one hand, the Plan terms dictate how forfeitures are to be used. In that regard, the Plan *requires*, without any discretion reserved to the Defendant, that forfeitures be directed towards restoring employer contributions for returning employees and offsetting contributions pursuant to Sections 2.4(C)(1), 4.1(A)(1), and 4.1(B)(1), and if forfeitures exceed contributions in a given payroll period, such "excess shall not be allocated but shall be carried forward and included with Employer Contributions during the next succeeding payroll period until such excess has been depleted" pursuant to Section 4.1(D)(6). [Doc. Nos. 47-1, 47-2]. Thus, it is unclear how under these Plan provisions *any* forfeiture amount during the relevant years could have been directed towards any other purpose than offsetting contributions when the employer contribution amount each year exceeded the available forfeiture amounts. On

---

[7] Specifically, Defendant cites several regulatory sources, including 26 C.F.R. § 1.401-7(a), which regulates pension plans and holds that forfeitures may not be used to increase plan member benefits; and proposed Treasury Department regulations providing that plans such as this one may, by their terms, direct forfeitures to the reduction of employer contributions (among other legitimate uses). *See* [Doc. No. 45] at 16–17.

the other hand, Section 12.6 does confer discretion on the Administrative Committee to use forfeitures to cover Plan expenses.

A number of considerations lead to the conclusion that that given the employer's obligation to follow the terms of a Plan, Section 12.6 can only be reasonably read to confer discretion in those situations where such forfeitures are not needed to satisfy their required, mandatory use under Sections 2.4(C)(1), 4.1(a)(1), 4.1(B)(1) and 4.1(D)(6), as any other reading essentially nullifies these mandatory-use provisions. As an initial matter, nothing in Section 12.6 would allow forfeitures to be allocated to individual participant accounts, as Plaintiff contends the fiduciary's duties may require if such forfeitures are not used to offset Plan expenses. *See, e.g.*, [Doc. No. 29] ¶ 18. In addition, given the unambiguous, mandatory language used in Sections 2.4(C)(1), 4.1(A)(1), 4.1(B)(1), and 4.1(D)(6), Plaintiff's position regarding forfeitures reduce to an argument that Defendant was required by ERISA to disregard the terms of the Plan and, contrary to the terms of the Plan, prioritize the use of forfeitures for, *inter alia*, the payment of administrative costs or a windfall to Plan participants, a proposition uniformly rejected by the courts. *See Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 239 (4th Cir. 2008) ("ERISA requires the Plan be administered as written and to do otherwise violates not only the terms of the Plan but causes the Plan to be in violation of ERISA."); *see also Foltz v. U.S. News & World Rep., Inc.*, 865 F.2d 364, 373 (D.C. Cir. 1989) (holding that ERISA's requirement that the fiduciary "'provid[e] benefits to participants and their beneficiaries' creates no exclusive duty of maximizing pecuniary benefits. Under ERISA the fiduciaries' duties are found largely in the terms of the plan itself"); *Bennett v. Conrail Matched Sav. Plan Admin. Comm.*, 168 F.3d 671, 677 (3d Cir. 1999) (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 445–47 (1999)) ("ERISA does not confer substantive rights on employees; rather it ensures that they will receive those benefits that the employers have

guaranteed to them."). And while the circumstances under which such discretion could be exercised appear limited, given the mandatory use of forfeitures not only for current employer contributions but future employer contributions, Section 12.6 does not become a nullity under this reading since there are circumstances where such discretion might be exercised, such as where the Employer suspends its contributions for financial reasons.

Accordingly, Plaintiff's claims regarding fiduciary breaches relating to forfeitures (Counts I–II) will be dismissed for failure to state a claim.[8]

Plaintiff's claim that Defendant violated ERISA's anti-inurement provision (Count III) fails for the same reason. As the Supreme Court has explained, "[t]he [anti-inurement] provision demands only that plan assets be held for supplying benefits to plan participants." [Doc. No. 59] at 10 (quoting *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 22 (2004)). Here, the Plan functions in that fashion by guaranteeing that forfeitures are used first to restore returning employee accounts and then to supplement future employer contributions—and because Plaintiff has not established that following such Plan terms is itself a fiduciary violation, Plaintiff similarly cannot establish that Plan assets "inure[d] to the benefit of any employer, or were ever held for any other reason than to "provid[e] benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." *See* 29 U.S.C. §

---

[8] Plaintiff argues that *Perez-Cruet v. Qualcomm Inc.*, No. 23-cv-1890, 2024 WL 2702207 (S.D. Cal. May 24, 2024), counsels a different result. There, the plan provided that "[f]orfeitures shall be used at the discretion of the Company to reduce the Employer Contributions next payable under the Plan or applied to Plan administrative expenses." *Id.* at *2. The district court denied a motion to dismiss various claims, including that the defendants breached the ERISA duty of prudence. In making that ruling, the court observed that while "Defendants may have complied with the Plan's terms which permit a choice" between using forfeitures for administrative costs and employer contributions, it was plausible that the defendants breached the duty of prudence by "letting the administrative expense charge fall on the participants rather than the employer." *Id.* at *3. Here, the Plan's applicable provisions do not allow for a similar choice for the use of forfeitures.

Plaintiff has also filed a Motion for Leave to File Notice of Supplemental Authority, [Doc. No. 68], in which she advised the Court of the recent issuance of a decision in a similar case in *Rodriguez v. Intuit, Inc. et al.*, No. 23-cv-05053-PCP, 2024 WL 3755367 (N.D. Cal. August 12, 2024) (unpublished). The Court has reviewed *Rodriguez* and finds it, like *Perez*, distinguishable from this case in that the plan at issue in *Rodriguez* provided the fiduciary with "discretionary authority … to either pay administrative expenses or reduce Intuit's matching contributions." *Id.* at *2.

1103(c)(1); *see also Hutchins v. HP Inc.*, No. 23-cv-05875, 2024 WL 3049456, at *7 (N.D. Cal. June 17, 2024) (collecting cases).

Plaintiff's claims regarding prohibited transactions (Counts IV-V) similarly fail because, as Defendant argues, "[i]n the absence of a predicate fiduciary act, there is not a basis for concluding there was a prohibited transaction." [Doc. No. 59] at 13. To the extent that Defendant established the Plan terms, it did so in its capacity as a "settlor," which does not give rise to fiduciary duties under ERISA. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996) ("Lockheed acted not as a fiduciary but as a settlor when it amended the terms of the Plan to include the retirement programs. Thus, § 406(a)'s requirement of fiduciary status is not met.").

### 2. Count VI: Breach of Fiduciary Duties Relating to Excessive Fees

Plaintiff also brings claims of breaches of ERISA fiduciary duties relating to the payment of recordkeeping fees to the Plan recordkeeper for the Professional Management Program (the "PMP") and legal fees to Groom Law Group (counsel for Defendant in this action). *See* [Doc. No. 29] ¶ 23.

### i. PMP Fees

To participate in the PMP, Plan members pay the recordkeeper "a fee of .45% of all assets invested in a participant's account up to the first $250,000 of assets and .30% of all assets above $250,001." *Id.* ¶ 24. The recordkeeper subcontracts with Financial Engines Advisors, LLC for PMP services, which include "customized strategic investment management services." *Id.* ¶ 25. Plaintiff claims that "an adequate investigation would have revealed to a prudent fiduciary that the Plan's PMP fees are and were excessive, unreasonable, and imprudent." *Id.* ¶ 38. Specifically, Plaintiff alleges that Plan participants do not receive "any investment advice," personalized investment management services," or "meaningful services" through the PMP, such that "the PMP

fees bear no rational relationship to any actual services provided to the Plan or its participants."
[Doc. No. 29] ¶¶ 25, 34. By comparison, Plaintiff alleges that the Vanguard target-date funds
offered through the Plan provide more diversification, attention, and daily management than the
PMP, despite costing only 0.05%. *Id.* ¶¶ 28-29. She also alleges that "the recordkeeper offers Plan
participants free online investment advice" and that this "free online advice is substantially the
same as the advice the recordkeeper provides for the .45% PMP fee." *Id.* ¶ 37.

Plaintiff's allegations concerning excessive fees fail to allege facts sufficient to make
plausible that the PMP fees were excessive and provided "zero benefit" to Plan members. For
example, the Plaintiff does not provide any "meaningful benchmarks" for comparison between the
PMP and other plans that offer similar services, something which several out-of-circuit courts and
at least one district court within the Fourth Circuit have held is required to plead a violation of the
duty of prudence in similar contexts. *See, e.g.*, *Tullgren v. Hamilton*, No. 22-cv-00856, 2023 WL
2307615, at *5–7 (E.D. Va. Mar. 1, 2023) (Nachmanoff, J.), *appeal dismissed sub nom. Tullgren
v. Booz Allen Hamilton, Inc.*, No. 23-1366, 2023 WL 6458653 (4th Cir. May 12, 2023); *Baumeister
v. Exelon Corp.*, No. 21-cv-6505, 2023 WL 6388064, at *9 (N.D. Ill. Sept. 29, 2023)).

In *Baumeister*, the plaintiff brought similar excessive fees claims, arguing that the
defendants' managed-account service charged excessive fees (0.50% to 0.30%) compared to other,
cheaper plans (0.30% to 0.15%), and because "the reasonable fee for the Plan's Management
program service was zero or very close to zero." 2023 WL 6388064, at *9. The district court
dismissed that claim because the plaintiff failed to provide any information about the proposed
comparator plans or substantiate the plaintiff's conclusory assertion that the value of the service
was "zero." *Id.* Here, Plaintiff's proposed comparators are similarly deficient. The Vanguard
funds, as target-date funds, are not comparable to managed-account services like the PMP. Neither

is the free advice available through the Plan a sufficient comparator, as it is impossible to tell from Plaintiff's allegations what that advice is or whether it bears any similarity to the services offered through managed-account services like the PMP.[9] *See, e.g.*, [Doc. No. 29] ¶ 37.

At bottom, Plaintiff's claims are simply that PMP fees are too high—but that is not enough to state a plausible claim for imprudence. *See Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020) ("[A] complaint cannot simply make a bare allegation that costs are too high, or returns are too low."). Instead, the complaint "must provide a sound basis for comparison—a meaningful benchmark," *id.*, and the FAC has not done so.[10]

### ii.   Legal Fees to Groom Law Group

Plaintiff alleges that the Plan retained Groom Law Group for "ERISA compliance consulting services," and that the Plan paid Groom "$704,480 in 2020, $658,659 in 2021; and $700,558 in 2022." [Doc. No. 29] ¶¶ 39-40. Plaintiff compares these amounts to similarly sized plans that paid Groom a fraction of that amount for what Plaintiff claims are "the same or similar

---

[9] Defendant points to the Plan's Annual Fee Disclosure Statement to demonstrate that the PMP is not, in fact, "substantially the same" as the free advice offered through the Plan; rather, the annual statement describes the free "advice" as being "up to you [the participant] to implement," while the PMP "can help you develop a personalized retirement plan, review your other retirement accounts, and then select and manage your account investments on a fee basis." [Doc. No. 18-1] at 7; *see United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 199 (4th Cir. 2022) (citation omitted) (explaining that courts are "not obliged to accept allegations that … 'contradict matters properly subject to judicial notice or by exhibit'"). Defendant argues that the annual statement is incorporated by Plaintiff's reference in the FAC to the fee schedule, which is contained in the annual statement. [Doc. No. 39] at 24. Plaintiff does not dispute whether the Court may consider the annual statement on this basis.

[10] Plaintiff also contends that Defendant's position has been "repeatedly rejected" by "courts across the country … in analogous cases," but the decisions Plaintiff cites are plainly distinguishable from her allegations. *See Cutrone v. Allstate Corp.*, No. 20-cv-6463, 2021 WL 4439415, at *3, *9 (N.D. Ill. Sept. 28, 2021) (denying the motion to dismiss parts of the plaintiff's claims because "defendants do not contest that plaintiffs have stated a claim with regard to the professional management program," and noting allegations that the "fees were also greater than those charged by comparable target date funds and robo-advisors"); *Pizarro v. Home Depot, Inc.*, No. 1:18-cv-01566, 2019 WL 11288656, at *5 (N.D. Ga. Sept. 20, 2019) (finding as dispositive plaintiff's allegations of "comparable firms" that "charged lower fees"); *Harmon v. Shell Oil*, No. 20-cv-00021 (S.D. Tx. March 31, 2021) ([Doc. No. 139] (Order); [Doc. No. 84] at ¶¶ 112–13 (Complaint) (identifying four managed-account service providers who provided "superior" or similar levels of service quality as the plan's managed-account provider); *Reichert v. Juniper Networks, Inc.*, No. 21-cv-06213 (N.D. Cal. April 27, 2022) ([Doc. No. 47] (Order re Motion to Dismiss); [Doc. No. 38] at ¶¶ 219–21 (Complaint)) (identifying four managed-account service providers that offered "virtually identical" services for lower fees, including one that serviced a similarly sized "mega Plan").

services." *Id.* ¶ 42. Plaintiff does not specify what these services are or provide any basis for her claim that such payments are an "imprudent waste." *Id.* ¶ 46.

As with Plaintiff's excessive fee claim with respect to the PMP, the FAC does not provide anything beyond conclusory allegations. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). For example, there are no facts alleged with respect to the services that Groom Law Group provided to the Plan as compared to services provided to the other clients identified in the FAC.[11]

### 3.   Count VII: Breach of the Duty to Monitor

Finally, Plaintiff's claim for a breach of the duty to monitor will be dismissed along with her other claims, as it is "wholly derivative" of the fiduciary breach claims. *Tullgren*, 2023 WL 2307615, at *8.

### B.   Plaintiff's Motion to Disqualify Defendant's Counsel

Plaintiff has also moved to disqualify Groom from representing Defendant in this action on the theory that because Groom has provided services to Defendant as to its administration of the Plan, Groom is now in an attorney-client relationship with the Plan itself and therefore should be deemed to be counsel for both the Plaintiff and the Defendant in the same case in violation of the Virginia Rules of Professional Conduct. [Doc. No. 39] at 3.[12]

Fourth Circuit caselaw directly forecloses Plaintiff's position. In *Colucci v. Agfa Corp. Severance Pay Plan*, an ERISA decision, the Fourth Circuit Court of Appeals explained that "[a]n attorney who advises his clients of their fiduciary obligations does not constructively become the

---

[11] The parties also dispute whether Plaintiff has standing to bring this claim. The Court does not reach the standing issue because, even assuming Plaintiff has standing, the FAC fails to state a claim for excessive legal fees.

[12] Specifically, Rule 1.7 provides that an attorney shall not represent a client if the representation involves a concurrent conflict of interest, which exists if the representation of one client is directly adverse to another client, or if there is a significant risk that the attorney's representation of one client will be materially limited by the attorney's responsibilities to another client. Va. Rule Pro. Conduct 1.7(a)(1), (2).

beneficiary's representative." 431 F.3d 170, 180 (4th Cir. 2005), *abrogated on other grounds by Champion v. Black & Decker (U.S.), Inc.*, 550 F.3d 353 (4th Cir. 2008).[13] Here, Plaintiff's position is based precisely on the contention rejected in *Colucci*.[14]

In support of her position that "the Plan and its participants" are Groom's true clients, Plaintiff cites *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 909 (D.D.C. 1982). [Doc. No. 39] at 3. That decision explained, in the context of a trustee's assertion of the attorney-client privilege in an action brought by former ERISA plan participants, that "[w]hen an attorney advises a fiduciary about a matter dealing with the administration of an employees' benefit plan, the attorney's client is not the fiduciary personally but, rather, the trust's beneficiaries." *Washington Star*, 543 F. Supp. at 909. But as the Second Circuit subsequently recognized in interpreting *Washington Star*, this is a "legal fiction" that "has the real consequence that an employer cannot assert the attorney-client privilege to keep the plan's beneficiaries from discovering otherwise privileged communications concerning the administration of an ERISA plan." *In re Long Island Lighting Co.*, 129 F.3d 268, 273 (2d Cir.

---

[13] Plaintiff contended at the hearing that *Colucci* had been overruled, but as the Fourth Circuit has recognized, the pronouncements in *Colucci* were affected only insofar as the Supreme Court has decided that the abuse-of-discretion standard applies when reviewing discretionary decisions by a dual administrator-fiduciary. *Champion*, 550 F.3d at 359.

[14] Ostensibly recognizing the impact of *Colucci*, Plaintiff argues that *Colucci* does not apply because unlike the claim in *Colucci*, which involved a challenge to a plan administrator's calculation of severance benefits, *Colucci*, 431 F.3d at 173, Plaintiff's claim is a putative class action brought "on behalf of" the Plan, and is therefore governed by corporate derivative action decisions in which courts found that disqualification of counsel was appropriate because attorneys in derivative actions "have a concurrent conflict of action when they attempt to represent both sides." [Doc. No. 57] at 4. None of the cases Plaintiff cites involved ERISA fiduciary challenges, and their relevance here is questionable at best. *See Lengyel-Fushtmi v. Bellis*, No. 512764/2021, 2022 WL 783944, at *2 (N.Y. Sup. Ct. 2022) (granting a motion that sought "to disqualify the same counsel from representing both the individual defendants and the corporate defendant"); *In re Richardson ex rel. Internet Med. Grp., Inc.*, No. A-4169-14T1, 2016 WL 854520, at *3 (N.J. Super. Ct. App. Div. Mar. 7, 2016) (finding a concurrent conflict in a case involving derivative claims against a corporate defendant); *Blue Water Sunset, LLC v. Markowitz*, 192 Cal.App.4th 477, 492 (Cal. Ct. App. 2011) (granting motion to disqualify in a case involving derivative claims against LLCs); *Fincanna Capital Corp. v. Cultivation Tech., Inc.*, No. G058700, 2021 WL 2644052, at *14–15 (Cal. Ct. App. June 28, 2021) (holding there can be no dual representation of a corporation and directors when the suit is brought by other shareholders); *JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 189 F. Supp. 2d 20, 22 (S.D.N.Y. 2002) (finding disqualification proper when a law firm attempted "to bring a multi-million dollar claim on behalf of one corporate client against the primary subsidiary of another of that law firm's corporate clients").

1997). Neither *Washington Star* nor any of the authorities cited by Plaintiff establish that this "legal fiction," also known as the "fiduciary exception"[15] to attorney-client privilege, has the effect of creating an attorney-client relationship for the purpose of disqualifying a fiduciary's attorney in a suit brought on behalf of the plan.

For these reasons, Plaintiff's motion to disqualify Defendant's counsel will be denied.

### IV. CONCLUSION

For the above reasons, it is hereby

**ORDERED** that the motions regarding briefing extensions, [Doc. Nos. 61, 68], be, and the same hereby are, **GRANTED**; and it is further

**ORDERED** that Defendant's Motion to Dismiss, [Doc. No. 44], be, and the same hereby is, **GRANTED**; and it is further

**ORDERED** that Plaintiff's Motion to Disqualify Counsel, [Doc. No. 38], be, and the same hereby is, **DENIED**; and it is further

**ORDERED** that the Consent Motion for a Ninety-Day Extension of the Scheduling Order, [Doc. No. 70], be, and the same hereby is, **DENIED** as moot.

The Clerk is directed to forward a copy of this Order to all counsel of record.

Alexandria, Virginia
September 5, 2024

/s/
Anthony J. Trenga
Senior United States District Judge

---

[15] When the Fourth Circuit adopted the fiduciary exception in a decision after *Colucci*, it clarified that the exception is not without its limits: it "will not apply, for example, to a fiduciary's communications with an attorney regarding her personal defense in an action for breach of fiduciary duty." *Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d 221, 228 (4th Cir. 2011). Similarly, the Court refuses to apply that legal fiction in the manner requested by the Plaintiff here.

18